Evan J. Smith
BRODSKY & SMITH
240 Mineola Boulevard
First Floor
Mineola, NY 11501
Telephone:    516.741.4977
Facsimile:    516.741.0626
esmith@brodskysmith.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARSHA EDERER, | Case No.: |
| Plaintiff, | **Complaint For:** |
| vs. | (1) Violation of § 14 (a) of the Securities Exchange Act of 1934 |
| HOMESTREET, INC., MARK K. MASON, JAMES R. MITCHELL JR., SCOTT M. BOGGS, SANDRA A. CAVANAUGH, JEFFREY D. GREEN, JOANNE HARRELL, NANCY D. PELLEGRINO, S. CRAIG TOMPKINS. | (2) Violation of § 20(a) of the Securities Exchange Act of 1934 |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff, Marsha Ederer ("Plaintiff"), by and through her attorneys, alleges upon information and belief, except for those allegations that pertain to her, which are alleged upon personal knowledge, as follows:

**SUMMARY OF THE ACTION**

1.      Plaintiff brings this stockholder action against HomeStreet, Inc. ("HomeStreet" or the "Company") and the Company's Board of Directors (the "Board" or the "Individual Defendants," and collectively with the Company, the "Defendants"), for violations of Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") as a result of Defendants' efforts to merge with FirstSun Capital Bancorp ("Parent"), through merger vehicle

Dynamis Subsidiary, Inc. ("Merger Sub," and together with Parent, "FirstSun") as a result of an unfair process, and to enjoin an upcoming stockholder vote on a proposed merger transaction (the "Proposed Transaction").

2.      The terms of the Proposed Transaction were memorialized in a January 19, 2024, filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement"). Under the terms of the Merger Agreement, the companies will combine in an all-stock transaction in which HomeStreet shareholders will receive 0.4345 of a share of FirstSun common stock for each share of HomeStreet common stock which represents a value of $14.75 per share.

3.      Thereafter, on March 8, 2024, FirstSun filed a Form S-4 attaching the Registration Statement (the "Registration Statement") with the SEC in support of the Proposed Transaction.

4.      The Proposed Transaction is unfair for a number of reasons. Significantly, it appears as though the Board has entered into an agreement which will provide little to no consideration to any Company stockholder and will significantly dilute the shares held by Plaintiff and other Company stockholders.

5.      The Registration Statement is materially deficient, depriving Plaintiff of the information necessary to make an intelligent, informed, and rational decision of whether to vote in favor of the Proposed Transaction, and is thus, in violation of the Exchange Act.  As detailed below, the Registration Statement omits and/or misrepresents material information concerning, among other things: (a) the sales process and in particular certain conflicts of interest for management; (b) the financial projections for HomeStreet and FirstSun, provided by HomeStreet management and FirstSun management respectively, to the Board and the Company's financial advisor Keefe, Bruyette & Woods, Inc. ("KBW"); (c) the data and inputs underlying the financial

valuation analyses, if any, that purport to support the fairness opinion created by KBW, and provided to the Board.

6.     Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff.  This action seeks to enjoin the Proposed Transaction.

## PARTIES

7.     Plaintiff is a citizen of Washington and, at all times relevant hereto, has been a HomeStreet stockholder.

8.     Defendant HomeStreet operates as the bank holding company for HomeStreet Bank which provides commercial, mortgage, and consumer/retail banking services in the Western United States. HomeStreet is incorporated under the laws of the State of Washington and has its principal place of business at 601 Union Street, Suite 2000, Seattle, WA 98101.  Shares of HomeStreet Common Stock are traded on the NASDAQ Stock Exchange under the symbol "HMST."

9.     Defendant Mark K. Mason ("Mason") has been the Chairman of the Board of Director of the Company at all relevant times. Mason is also the Chief Executive Officer ("CEO") and President of the Company.

10.     Defendant James R. Mitchell, Jr. ("Mitchell") has been a director of the Company at all relevant times.

11.     Defendant Scott M. Boggs ("Boggs") has been a director of the Company at all relevant times.

12.     Defendant Sandra A. Cavanaugh ("Cavanaugh") has been a director of the Company at all relevant times.

13.    Defendant Jeffrey D. Green ("Green") has been a director of the Company at all relevant times.

14.    Defendant Joanne Harrell ("Harrell") has been a director of the Company at all relevant times.

15.    Defendant Nancy D. Pellegrino ("Pellegrino") has been a director of the Company at all relevant times.

16.    Defendant S. Craig Tompkins ("Tompkins") has been a director of the Company at all relevant times.

17.    Defendants identified in ¶¶ 9-16 are collectively referred to as the "Individual Defendants."

18.    Non-Party FirstSun operates as a bank holding company for Sunflower Bank that provides commercial and consumer banking and financial services to small and medium-sized companies in Texas, Kansas, Colorado, New Mexico, and Arizona.

19.    Non-Party Merger Sub is a wholly owned subsidiary of FirstSun created to effectuate the Proposed Transaction.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.  The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

21.    Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present

in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District; for example, the Company's stock trades on the NASDAQ Stock Exchange which is headquartered in this District.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

*Company Background*

23.     HomeStreet operates as the bank holding company for HomeStreet Bank, providing commercial, mortgage, and consumer/retail banking services in the Western United States. The Company offers personal and business checking, savings, interest-bearing negotiable order of withdrawal, and money market accounts, as well as certificates of deposit; credit cards; insurance; and treasury management services.

*The Flawed Sales Process*

24.     As detailed in the Registration Statement, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants and was designed with only one concern in mind – to effectuate a sale of the Company.

25.     Notably, the Registration Statement fails to disclose adequate reasoning as to why the Board would agree to a deal in which stockholders' interests would be diluted, with little to no consideration given.

26.     The Registration Statement fails to disclose why the Board created a transaction committee (the "Transaction Committee") to oversee the strategic process but allowed the Board final approval on entering into the Proposed Transaction.

27.     Given the fact that a ready, willing and able counterparty (the "First Bidder") made cash offers of $9.84, $12.04, $13.32, and finally $15.19, none of which required financing, while FirstSun's per share equivalent bids of $8.00 - $9.00, $10.00, $12.00, and $14.75 required financing from Wellington Management ("Wellington") and others, disclose:

> a.  How the terms of the draft agreements exchanged with First Bidder and FirstSun differed, including but not limited to, termination fees, reverse termination fees, and solicitation/non-solicitation provisions;
>
> b.  The Boards' reasoning for entering into a deal in which the required financing contingencies of the buyer would dilute interest in the combined company; and
>
> c.  The Board's rationale that FirstSun's final offer of $14.75 provided superior value to First Bidder's final offer of $15.19.

28.     Further, the Registration Statement is silent as to the specific nature of the confidentiality agreement entered into between the Company and FirstSun, the specific ways, if any, this agreement differed from any other agreement with potentially interested third parties not specifically mentioned by the Registration Statement, if so, in all specific manners, including all specific terms of any such included "don't-ask, don't-waive" provisions or standstill provisions contained therein, including, all specific conditions, if any, under which such provisions would fall away.

29.    The Registration Statement fails to adequately disclose the totality of the communications regarding post-transaction employment during the negotiation of the underlying transaction.

30.    It is not surprising, given this background to the overall sales process, that it was conducted in an inappropriate and misleading manner.

***The Proposed Transaction***

31.    On January 16, 2024, HomeStreet and FirstSun issued a joint press release announcing the Proposed Transaction.  The press release stated, in relevant part:

> DENVER & SEATTLE--(BUSINESS WIRE)-- FirstSun Capital Bancorp ("FirstSun," or the "Company") (OTCQX: FSUN), the holding company of Dallas-based Sunflower Bank, N.A. ("Sunflower Bank") and Seattle-based HomeStreet, Inc. ("HomeStreet") (Nasdaq: HMST), the holding company of HomeStreet Bank ("HomeStreet Bank") jointly announced today that they have entered into a definitive merger agreement, which was unanimously approved by the board of directors of both companies. Under the terms of the agreement, HomeStreet and HomeStreet Bank will merge with and into FirstSun and Sunflower Bank, respectively, with HomeStreet Bank continuing to operate under its tradename in its current markets. Under the terms of the agreement, the companies will combine in an all-stock transaction in which HomeStreet shareholders will receive 0.4345 of a share of FirstSun common stock for each share of HomeStreet common stock which represents a value of $14.75 per share representing a 37% premium to the closing price per share of HomeStreet Shares on January 12, 2024. The combined entity is expected to be listed on the NASDAQ upon closing.
>
> FirstSun also announced today that it has entered into investment agreements with investors to raise capital to support the merger, led by Wellington Management ("Wellington", and combined the "Investors"). In aggregate, $175 million of common stock will be issued to those Investors: (a) $80 million of which will be issued to Wellington immediately following today's merger announcement, and (b) the remaining $95 million of which will be issued concurrently with, and subject to, closing of the merger ("acquisition equity"). The proceeds of this capital are expected to support the pro forma company's balance sheet, resulting in CET1 of 9%+ pro forma at the consolidated BHC level and 10%+ at the bank level.
>
> Upon completion of the merger, the shares issued to HomeStreet shareholders are expected to comprise 22% of the outstanding shares of the combined company, the shares issued to Investors in the common stock issuance are expected to represent 14% of the combined company, and the expected remaining ownership of 64% will be held by legacy FirstSun common shareholders.
>
> Once completed, the merger will create a premier regional bank with $17 billion in total assets and 129 branch locations across some of the most attractive markets in the United States. The expanded footprint complements FirstSun's current presence

in the high growth markets of the Southwest to include HomeStreet's strong presence in Southern California, Hawaii, and other key markets in the Pacific Northwest.

Mollie Hale Carter, Executive Chairman of FirstSun, and Neal Arnold, CEO, President & Director of FirstSun, will retain their current roles at the combined company. Mark Mason, who currently serves as Executive Chairman, President & CEO of HomeStreet, will serve as Executive Vice Chairman at the combined company following the merger. Additionally, three current HomeStreet directors, inclusive of Mr. Mason, will join the combined company board of directors at closing.

"It brings us great excitement to welcome aboard HomeStreet's valued customers and associates," said Mollie Hale Carter, Executive Chairman of FirstSun and Sunflower. "We are very confident that this merger will enhance our ability to deliver stronger and more sustainable growth with greater earnings power and shareholder value creation to our combined shareholders. Each entity brings a presence in large, dynamic markets that are ripe for future organic growth. The combination of FirstSun and HomeStreet creates a premier midcap bank in the nation's best markets and an opportunity to deploy FirstSun's proven playbook of C&I focused growth. FirstSun is excited about the strategic synergies of this merger and the opportunities created to deliver strong sustainable growth and superior shareholder value creation. The HomeStreet team brings additional talent to enhance our specialty business line capabilities across this expanded footprint."

Mark Mason, Chairman, CEO and President of HomeStreet said, "This merger validates the intrinsic value of HomeStreet's loyal customer base, strong management and dynamic markets in which we operate and allows our shareholders to participate in the benefits of the combination going forward. The combined company will have an attractive and comprehensive product suite and market footprint as well as a more diversified loan portfolio and increased lending capabilities across asset classes, geographies and industry verticals. We believe this merger will also improve our customers' experience and create new opportunities for our employees enabling us to retain and attract top talent. Both organizations share strong credit and risk management cultures and a deep commitment to our customers, community service and being good corporate citizens."

"We are excited to be an anchor investor in the creation of a new $17 billion asset bank serving customers in high growth markets in the US," said Nick Adams, portfolio manager, Wellington Management. "We believe bringing together these companies and combining their management teams will bolster the scale and diversification of their business and create greater value for shareholders."

**Strategic Benefits of the Transaction**

- **Operating in the largest and fastest growing markets:** Presence in 6 of the top 10 fastest growing MSAs in the United States and a presence in 8 of the 10 largest Central and Western United States MSAs.
- **Complementary business lines and lending expertise:** Minimal geographic operating overlap between FirstSun and HomeStreet provides for a complementary merger that combines a strong C&I platform with an extensive multi-family lending platform and two similarly sized single family lending platforms.

- **Combination of two top-tier core deposit franchises:** Granular deposit relationships with an emphasis on generating low-cost, core deposits support overall growth prospects.
- **Well-positioned balance sheet and revenue streams regardless of macro-environment conditions:** Interest rate neutral balance sheet through combining an asset-sensitive FirstSun and a liability sensitive HomeStreet, as well as a fully marked HomeStreet loan and securities portfolio, and strong fee income sources, including HomeStreet's Fannie Mae Delegated Underwriter and Servicer business.
- **Material and immediate upside to current valuation:** Significant valuation upside as the combined company is expected to generate profitability returns above peer levels.

**Financial Benefits of the Merger**

The financial benefits of the transaction are compelling, with estimated 2025 EPS accretion of 30%+ and a < 2 years earn back on tangible book value dilution. The pro forma combined company financial metrics are based on management estimates for FirstSun and HomeStreet, estimated combined company cost synergies, anticipated purchase accounting adjustments, the expected merger closing time-frame, and the capital raise. On a pro forma basis, the business is expected to deliver compelling operating and return metrics in 2025 with cost savings on a fully-phased in basis, including:

- Total Assets of approximately $17 Billion

- Tangible Common Equity at Closing of approximately $1.2 Billion

- Tangible Common Equity to Tangible Assets Ratio of ~ 7.2%

- Common Equity Tier 1 Capital Ratio of ~ 9.1%

- Net Interest Margin of ~ 3.9%

- Fee Income to Total Revenue of ~ 22%

- Return on Average Assets of ~ 1.4%; and

- Return on Average Tangible Common Equity of ~ 17%

**Transaction Details**

FirstSun will be the legal and accounting acquirer and HomeStreet and HomeStreet Bank will merge with and into FirstSun and Sunflower Bank, respectively. HomeStreet Bank will continue to operate under its name in its current markets of operation. Under the terms of the merger agreement, HomeStreet shareholders will receive 0.4345 of a share of FirstSun common stock for each share of HomeStreet common stock.

In the equity capital raise transaction, FirstSun will sell approximately (i) 2.46 million shares of its common stock at an issuance price of $32.50 per share at the announcement of the merger and (ii) 2.92 million shares of its common stock at an issuance price of $32.50 per share at the closing of the merger.

**Timing and Approvals**

The parties expect the closing of the merger to occur in the middle of 2024, subject to satisfaction of closing conditions, including receipt of customary required regulatory approvals and requisite approval by the shareholders of each company. Principal FirstSun investors, as well as members of the HomeStreet Board of Directors, have executed voting agreements committing to support the transaction. The acquisition equity capital is expected to close concurrently with the merger, subject to the concurrent closing of the merger and other closing conditions.

*Potential Conflicts of Interest*

32.    The breakdown of the benefits of the deal indicates that HomeStreet insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders such as Plaintiff. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff as a public stockholder of HomeStreet.

33.    For example, Company insiders, currently own large illiquid blocks of Company stock all of which will be converted into the Merger Consideration not shared with public Company stockholder such as Plaintiff upon the consummation of the Proposed Transaction as follows:

| Name and Address of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of Class |
|---|---|---|
| Mark K. Mason[4] | 188,946 | 1.0% |
| Scott M. Boggs[5] | 37,376 | * |
| Sandra A. Cavanaugh | 20,593 | * |
| Jeffrey D. Green[6] | 18,492 | * |
| Joanne R. Harrell | 13,322 | * |
| James R. Mitchell, Jr. | 17,161 | * |
| Nancy D. Pellegrino[7] | 16,223 | * |
| S. Craig Tompkins[8] | 5,689 | * |
| John M. Michel[9] | 86,409 | * |
| William D. Endresen[10] | 20,917 | * |
| *All executive officers and directors as a group (18 persons)[11]* | 724,104 | 3.8% |

34.    In addition, Company insiders currently own company options all of which will be subject to accelerated vesting upon the consummation of the Proposed Transaction, and converted

into the Merger Consideration not shared with public Company stockholders such as Plaintiff upon the consummation of the Proposed Transaction as follows:

| Name | Unvested Pre-2024 HomeStreet RSUs (#) | Unvested Pre-2024 HomeStreet RSUs ($) | Unvested HomeStreet PSUs (#) | Unvested HomeStreet PSUs ($) | Unvested 2024 HomeStreet RSUs (#) | Unvested 2024 HomeStreet RSUs ($) |
|---|---|---|---|---|---|---|
| Mark K. Mason | 12,469 | $ 186,037 | 55,891 | $ 833,894 | 46,744 | $ 697,420 |
| John M. Michel | 4,282 | $ 63,887 | 23,797 | $ 355,051 | 16,052 | $ 239,496 |
| William D. Endresen | 3,138 | $ 46,819 | 17,437 | $ 260,160 | 11,761 | $ 175,474 |
| Godfrey B. Evans | 2,363 | $ 35,256 | 13,129 | $ 195,885 | 8,855 | $ 132,117 |
| Erik D. Hand | 812 | $ 12,115 | 4,510 | $ 67,289 | 3,042 | $ 45,387 |
| Troy D. Harper | 2,202 | $ 32,854 | 12,446 | $ 185,694 | 8,564 | $ 127,775 |
| Jay C. Iseman | 2,138 | $ 31,899 | 12,035 | $ 179,562 | 8,169 | $ 121,881 |
| Paulette Lemon | 1,6.38 | $ 24,439 | 9,348 | $ 139,472 | 6,389 | $ 95,324 |
| David Parr | 1,909 | $ 28,482 | 11,368 | $ 169,611 | 7,946 | $ 118,554 |
| Darrell S. van Amen | 2,629 | $ 39,225 | 14,604 | $ 217,892 | 9,849 | $ 146,947 |
| Diane P. Novak | 1,209 | $ 18,038 | 8,486 | $ 126,611 | 6,456 | $ 96,324 |

35.     In addition, employment agreements with certain HomeStreet executives entitle such executives to severance packages should their employment be terminated under certain circumstances. These 'golden parachute' packages are significant and will grant each director or officer entitled to them millions of dollars that is not shared by public Company stockholders such as Plaintiff as follows:

| Name | Cash ($)[1] | Equity ($)[2] | Perquisites / benefits ($)[3] | Total ($) |
|---|---|---|---|---|
| Mark K. Mason | $3,741,020 | $1,717,352 | $ 0 | $5,458,372 |
| John M. Michel | $1,566,076 | $ 658,435 | $ 55,209 | $2,279,720 |
| William D. Endresen | $2,437,708 | $ 482,453 | $ 41,421 | $2,961,582 |

| Name | Pre-2024 HomeStreet RSUs ($)[a] | HomeStreet PSUs ($)[a] | Converted RSU Awards ($)[b] | Value of All Equity Awards ($) |
|---|---|---|---|---|
| Mark K. Mason | $ 186,037 | $ 833,894 | $ 697,420 | $1,717,351 |
| John M. Michel | $ 63,887 | $ 355,051 | $ 239,496 | $ 658,434 |
| William D. Endresen | $ 46,819 | $ 260,160 | $ 175,474 | $ 482,453 |

36.     Given that all of the offers received from the parties during the strategic process involved post close employment and compensation for Defendant Mason, the Registration Statement fails to provide adequate information regarding his involvement in the process, and/ or why he was not removed from the process given the benefits he is set to receive at the close of the Proposed Transaction.

37.     The Registration Statement also fails to adequately disclose the totality of the communications regarding post-transaction employment during the negotiation of the underlying transaction. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.

38.     Thus, while the Proposed Transaction is not in the best interests of HomeStreet, Plaintiff or Company stockholders, it will produce lucrative benefits for the Company's officers and directors.

***The Materially Misleading and/or Incomplete Registration Statement***

39.     On March 8, 2024, the HomeStreet Board caused to be filed with the SEC a materially misleading and incomplete Registration Statement that, in violation the Exchange Act, failed to provide Plaintiff in her capacity as a Company stockholder with material information and/or provides materially misleading information critical to the total mix of information available to Plaintiff concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

40.     Specifically, the Registration Statement fails to disclose material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction.  In particular, the Registration Statement fails to disclose:

a.  Adequate reasoning as to why the Board would agree to a deal in which stockholders' interests would be diluted, with little to no consideration given;

b.  Why the Board created a transaction committee (the "Transaction Committee") to oversee the strategic process but allowed the Board final approval on entering into the Proposed Transaction;

c.  Given the fact that a ready, willing and able counterparty (the "First Bidder") made cash offers of $9.84, $12.04, $13.32, and finally $15.19, none of which required financing, while FirstSun's per share equivalent bids of $8.00 - $9.00, $10.00, $12.00, and $14.75 required financing from Wellington Management ("Wellington") and others, disclose:

   i.  How the terms of the draft agreements exchanged with First Bidder and FirstSun differed, including but not limited to, termination fees, reverse termination fees, and solicitation/non-solicitation provisions;

   ii.  The Boards' reasoning for entering into a deal in which the required financing contingencies of the buyer would dilute interest in the combined company; and

   iii.  The Board's rationale that FirstSun's final offer of $14.75 provided superior value to First Bidder's final offer of $15.19.

d.  Whether the confidentiality agreements entered into by the Company with FirstSun differed from any other unnamed confidentiality agreement entered into between the Company and an interested third parties, and if so the specific manner in which they differed;

e. All specific conditions under which any standstill provision contained in any entered confidentiality agreement entered into between the Company and potentially interested third parties throughout the sales process, including FirstSun, would fall away;

f. The totality of the communications regarding post-transaction employment during the negotiation of the underlying transaction.

*Omissions and/or Material Misrepresentations Concerning HomeStreet and FirstSun's Financial Projections*

41.    The Registration Statement fails to provide material information concerning financial projections for HomeStreet provided by HomeStreet management to the Board and KBW and relied upon by KBW in its discussion with the Company regarding the Proposed Transaction. The Registration Statement also fails to provide material information concerning financial projections for FirstSun provide by FirstSun management to the Board and KBW and relied upon by KBW in its discussion with the Company regarding the Proposed Transaction. The Registration Statement fails to disclose management-prepared financial projections for the Company.

42.    Notably, the Registration Statement reveals that as part of its analysis, KBW reviewed, "financial and operating forecasts and projections of HomeStreet that were prepared by HomeStreet management, provided to and discussed with KBW by such management, and used and relied upon by KBW at the direction of such management and with the consent of the HomeStreet board of directors."

43.    Further, the Registration Statement reveals that as a part of its analysis, KBW reviewed, "financial and operating forecasts and projections of FirstSun that were prepared by FirstSun management, provided to and discussed with KBW by such management, and used and

relied upon by KBW based on such discussions, at the direction of HomeStreet management and with the consent of the HomeStreet board of directors."

44.     The Registration Statement should have, but fails to provide, certain information in the projections that HomeStreet management may have provided to the Board and KBW.  Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects."  *In re Netsmart Techs., Inc. S'holders Litig*., 924 A.2d 171, 201-203 (Del. Ch. 2007).

45.     With regard to the *HomeStreet Prospective Financial Information* provided by HomeStreet management, the Registration Statement fails to disclose material line items for the following metrics:

> a.   The underlying inputs, metrics, and assumptions used to determine the estimates of net income for the years ending December 31, 2024 and December 31, 2025;
>
> b.   The underlying inputs, metrics, and assumptions used to determine the estimated EPS for the years ending December 31, 2024 and December 31, 2025;
>
> c.   The underlying inputs, metrics, and assumptions used to determine the estimated total assets of $9,439.4 million, deposits of $6,634.1 million, and gross loans of $7,448.1 million as of the June 30, 2024 closing balance sheet;
>
> d.   The underlying inputs, metrics, and assumptions used to determine the estimated annual net growth rates for the years ending December 31, 2026, December 31, 2027, and December 31, 2028; and

e. The underlying inputs, metrics, and assumptions used to determine the estimated pre-tax cost of cash of 4.00% and an estimated marginal tax rate of 23.0%.

46.     With regard to the *FirstSun Prospective Financial Information* provided by FirstSun management, the Registration Statement fails to disclose material line items for the following metrics:

a. The underlying inputs, metrics, and assumptions used to determine the estimates of net income for the years ending December 31, 2024 through December 31, 2026;

b. The underlying inputs, metrics, and assumptions used to determine the estimated EPS for the years ending December 31, 2024 through December 31, 2026;

c. The underlying inputs, metrics, and assumptions used to determine the estimated total assets of $8,030.0 million, deposits of $6,788.0 million, and gross loans of $6,540.3 million as of the June 30, 2024 closing balance sheet;

d. The underlying inputs, metrics, and assumptions used to determine the estimated annual net growth rates for the years ending December 31, 2027, and December 31, 2028; and

e. The underlying inputs, metrics, and assumptions used to determine the estimated pre-tax cost of cash of 4.00% and an estimated marginal tax rate of 23.0%.

47.     The Registration Statement fails to provide financials projections for the combined company, particularly given the fact that HomeStreet based its decision to enter into the transaction, in part, on the basis of the projections for the combined company.

48.     This information is necessary to provide Plaintiff, in her capacity as a Company stockholder, with a complete and accurate picture of the sales process and its fairness.  Without this information, Plaintiff is not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

49.     Without accurate projection data for HomeStreet and FirstSun being presented in the Registration Statement, Plaintiff is unable to properly evaluate the Company's true worth, the accuracy of the exchange ratio, or make an informed decision whether to vote in favor of the Proposed Transaction.  As such, the Board has violated the Exchange Act by failing to include such information in the Registration Statement.

### *Omissions and/or Material Misrepresentations Concerning any Financial Analyses by KBW*

50.     In the Registration Statement, KBW describes its fairness opinion and the various valuation analyses performed to render such opinion. However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions. Without this information, one cannot replicate the analyses, confirm the valuations, or evaluate the fairness opinions:

51.     With respect to the *Selected Companies Analysis* for both HomeStreet and FirstSun, the Registration Statement fails to disclose the following:

     a.   Regarding the *FirstSun Selected Companies Analysis*, disclose:

i. The underlying inputs, metrics, and assumptions used to determine the MRQ Core Return on Average Assets for each of the Public Companies and FirstSun;

ii. The underlying inputs, metrics, and assumptions used to determine the MRQ Core Return on Average Tangible Common Equity for each of the Public Companies and FirstSun;

iii. The underlying inputs, metrics, and assumptions used to determine the MRQ Net Interest Margin for each of the Public Companies and FirstSun;

iv. The underlying inputs, metrics, and assumptions used to determine the MRQ Fee Income/ Revenue Ratio for each of the Public Companies and FirstSun;

v. The underlying inputs, metrics, and assumptions used to determine the MRQ Non Interest Expense/ Average Assets for each of the Public Companies and FirstSun;

vi. The underlying inputs, metrics, and assumptions used to determine the MRQ Efficiency Ratio for each of the Public Companies and FirstSun;

vii. The underlying inputs, metrics, and assumptions used to determine the Tangible Common Equity/ Tangible Assets for each of the Public Companies and FirstSun;

viii. The underlying inputs, metrics, and assumptions used to determine the Total Capital Ratio for each of the Public Companies and FirstSun;

ix.   The underlying inputs, metrics, and assumptions used to determine the Loans HFI/ Deposits for each of the Public Companies and FirstSun;

x.   The underlying inputs, metrics, and assumptions used to determine the Loan Loss Reserve/ Loans for each of the Public Companies and FirstSun;

xi.   The underlying inputs, metrics, and assumptions used to determine the Nonperforming Assets/ Loans + OREO for each of the Public Companies and FirstSun;

xii.   The underlying inputs, metrics, and assumptions used to determine the MRQ Net Charge-offs/ Average Loans for each of the Public Companies and FirstSun;

xiii.   The underlying inputs, metrics, and assumptions used to determine the Price / Tangible Book Value per Share for each of the Public Companies and FirstSun;

xiv.   The underlying inputs, metrics, and assumptions used to determine the Price/ LTM EPS for each of the Public Companies and FirstSun;

xv.   The underlying inputs, metrics, and assumptions used to determine the Price/ 2024 EPS Estimate for each of the Public Companies and FirstSun; and

xvi.   The underlying inputs, metrics, and assumptions used to determine the Price/ 2025 EPS Estimate for each of the Public Companies and FirstSun.

b.   Regarding the *HomeStreet Selected Companies Analysis*, disclose:

i. The underlying metrics observed for each of the Public Companies Analyzed;

ii. The underlying inputs, metrics, and assumptions used to determine the MRQ Core Return on Average Assets for each of the Public Companies and HomeStreet;

iii. The underlying inputs, metrics, and assumptions used to determine the MRQ Core Return on Average Tangible Common Equity for each of the Public Companies and HomeStreet;

iv. The underlying inputs, metrics, and assumptions used to determine the MRQ Net Interest Margin for each of the Public Companies and HomeStreet;

v. The underlying inputs, metrics, and assumptions used to determine the MRQ Fee Income/ Revenue Ratio for each of the Public Companies and HomeStreet;

vi. The underlying inputs, metrics, and assumptions used to determine the MRQ Non Interest Expense/ Average Assets for each of the Public Companies and HomeStreet;

vii. The underlying inputs, metrics, and assumptions used to determine the MRQ Efficiency Ratio for each of the Public Companies and HomeStreet;

viii. The underlying inputs, metrics, and assumptions used to determine the Tangible Common Equity/ Tangible Assets for each of the Public Companies and HomeStreet;

ix.   The underlying inputs, metrics, and assumptions used to determine the Total Capital Ratio for each of the Public Companies and HomeStreet;

x.   The underlying inputs, metrics, and assumptions used to determine the Loans HFI/ Deposits for each of the Public Companies and HomeStreet;

xi.   The underlying inputs, metrics, and assumptions used to determine the Loan Loss Reserve/ Loans for each of the Public Companies and HomeStreet;

xii.   The underlying inputs, metrics, and assumptions used to determine the Nonperforming Assets/ Loans + OREO for each of the Public Companies and HomeStreet;

xiii.   The underlying inputs, metrics, and assumptions used to determine the MRQ Net Charge-offs/ Average Loans for each of the Public Companies and HomeStreet;

xiv.   The underlying inputs, metrics, and assumptions used to determine the Price / Tangible Book Value per Share for each of the Public Companies and HomeStreet;

xv.   The underlying inputs, metrics, and assumptions used to determine the Price/ LTM EPS for each of the Public Companies and HomeStreet;

xvi.   The underlying inputs, metrics, and assumptions used to determine the Price/ 2024 EPS Estimate for each of the Public Companies and HomeStreet; and

xvii. The underlying inputs, metrics, and assumptions used to determine the Price/ 2025 EPS Estimate for each of the Public Companies and HomeStreet.

52.     With respect to the *Selected Transaction Analysis*, the Registration Statement fails to disclose the following:

a.   The specific date on which each selected transaction was consummated;

b.   The aggregate value of each selected transaction;

c.   The underlying inputs, metrics, and assumptions used to determine the Price / Tangible Book Value per Share for each of the Transactions analyzed including FirstSun and HomeStreet;

d.   The underlying inputs, metrics, and assumptions used to determine the Price / LTM EPS for each of the Transactions analyzed including FirstSun and HomeStreet;

e.   The underlying inputs, metrics, and assumptions used to determine the Price / Forward EPS for each of the Transactions analyzed including FirstSun and HomeStreet;

f.   The underlying inputs, metrics, and assumptions used to determine the Core Deposit Premium for each of the Transactions analyzed including FirstSun and HomeStreet; and

g.   The underlying inputs, metrics, and assumptions used to determine the One-Day Market Premium for each of the Transactions analyzed including FirstSun and HomeStreet.

53.     With respect to the *Relative Contribution Analysis*, the Registration Statement fails to disclose the following:

a.   The underlying metrics used to determine FirstSun's percentage of Total Pre-Transaction Market Capitalization;

b.   The underlying metrics used to determine HomeStreet's percentage of Total Pre-Transaction Market Capitalization;

c.   The underlying metrics used to determine FirstSun's percentage of Total Assets;

d.   The underlying metrics used to determine HomeStreet's percentage of Total Assets;

e.   The underlying metrics used to determine FirstSun's percentage of Total Gross Loans Held for Investment;

f.   The underlying metrics used to determine HomeStreet's percentage of Total Gross Loans Held for Investment;

g.   The underlying metrics used to determine FirstSun's percentage of Total Deposits;

h.   The underlying metrics used to determine HomeStreet's percentage of Total Deposits;

i.   The underlying metrics used to determine FirstSun's percentage of Total Tangible Common Equity;

j.   The underlying metrics used to determine HomeStreet's percentage of Total Tangible Common Equity;

k.  The underlying metrics used to determine FirstSun's percentage of Total Adjustable Tangible Common Equity (9/30 FMV Marks);

l.  The underlying metrics used to determine HomeStreet's percentage of Total Adjustable Tangible Common Equity (9/30 FMV Marks);

m.  The underlying metrics used to determine FirstSun's percentage of Total 2024 Estimated Earnings;

n.  The underlying metrics used to determine HomeStreet's percentage of Total 2024 Estimated Earnings;

o.  The underlying metrics used to determine FirstSun's percentage of Total 2025 Estimated Earnings; and

p.  The underlying metrics used to determine HomeStreet's percentage of Total 2025 Estimated Earnings.

54.  With respect to the *Financial Impact Analysis,* the Registration Statement fails to disclose the following:

a.  The underlying inputs, metrics, and assumptions used to determine that the merger could be accretive to each of FirstSun's estimated 2024 EPS and estimated 2025 EPS and dilutive to FirstSun's estimated tangible book value per share at closing assumed as of June 30, 2024; and

b.  The underlying inputs, metrics, and assumptions used to determine that each of FirstSun's tangible common equity to tangible assets ratio, Tier 1 Leverage Ratio, Common Equity Tier 1 (CET1) Ratio, Tier 1 Capital Ratio and Total Risk-based Capital Ratio at closing assumed as of June 30, 2024 could be lower.

55.     With respect to the *Dividend Discount Model Analysis,* the Registration Statement fails to disclose the following:

      a.   Regarding *FirstSun Dividend Discount Model Analysis*, disclose:

          i.   The underlying inputs, metrics, and assumptions used to determine the Discount rates ranging from 10.0% to 14.0% utilized; and

          ii.   The underlying inputs, metrics, and assumptions used to determine the multiples range of 8.0x to 12.0x utilized.

      b.   Regarding *HomeStreet Dividend Discount Model Analysis*, disclose:

          i.   The underlying inputs, metrics, and assumptions used to determine the Discount rates ranging from 12.0% to 146.0% utilized; and

          ii.   The underlying inputs, metrics, and assumptions used to determine the multiples range of 8.0x to 12.0x utilized.

56.     These disclosures are critical for Plaintiff to be able to make an informed decision on whether to vote in favor of the Proposed Transaction.

57.     Without the omitted information identified above, Plaintiff is missing critical information necessary to evaluate whether the proposed consideration truly maximizes her value and serves her interest as a stockholder.  Moreover, without the key financial information and related disclosures, Plaintiff cannot gauge the reliability of the Board's determination that the Proposed Transaction is in her best interests as a public HomeStreet stockholder.  As such, the Board has violated the Exchange Act by failing to include such information in the Registration Statement.

## FIRST COUNT

## Violations of Section 14(a) of the Exchange Act

## (Against All Defendants)

58.     Plaintiff repeats all previous allegations as if set forth in full herein.

59.     Defendants have disseminated the Registration Statement with the intention of soliciting stockholders, including Plaintiff, to vote in favor of the Proposed Transaction.

60.     Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction.  Specifically, Section 14(a) provides that:

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of her name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

61.     As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

62.     The Registration Statement was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

63.     The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

64.     The Individual Defendants were at least negligent in filing a Registration Statement that was materially misleading and/or omitted material facts necessary to make the Registration Statement not misleading.

65.     The misrepresentations and omissions in the Registration Statement are material to Plaintiff, and Plaintiff will be deprived of her entitlement to decide whether to vote her shares in favor of the Proposed Transaction on the basis of complete information if such misrepresentations and omissions are not corrected prior to the stockholder vote regarding the Proposed Transaction.

## SECOND COUNT

### Violations of Section 20(a) of the Exchange Act

### (Against all Individual Defendants)

66.     Plaintiff repeats all previous allegations as if set forth in full herein.

67.     The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or should have known that the Registration Statement was materially misleading to Plaintiff in her capacity as a Company stockholder.

68.     The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware or should have been aware that materially false and misleading statements

were being issued by the Company in the Registration Statement and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  The Individual Defendants were able to, and did, control the contents of the Registration Statement. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Registration Statement before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

69.     The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of HomeStreet's business, the information contained in its filings with the SEC, and its public statements.  Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from Plaintiff and Company, and that the Registration Statement was misleading.  As a result, the Individual Defendants are responsible for the accuracy of the Registration Statement and are therefore responsible and liable for the misrepresentations contained herein.

70.     The Individual Defendants acted as controlling persons of HomeStreet within the meaning of Section 20(a) of the Exchange Act.  By reason of their position with the Company, the Individual Defendants had the power and authority to cause HomeStreet to engage in the wrongful conduct complained of herein.  The Individual Defendants controlled HomeStreet and all of its employees.  As alleged above, HomeStreet is a primary violator of Section 14 of the Exchange Act and SEC Rule 14a-9.  By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in her favor and against the Defendants, as follows:

A.      Enjoining the Proposed Transaction;

B.      In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

C.      Directing the Individual Defendants to exercise their fiduciary duties to disseminate a Registration Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.      Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: April 11, 2024                    **BRODSKY & SMITH**

By: *Evan J. Smith*
Evan J. Smith
240 Mineola Boulevard
Mineola, NY  11501
Phone:  (516) 741-4977
Facsimile (561) 741-0626

*Attorneys for Plaintiff*